2002 UT 123

**STATE of Utah, Plaintiff and Appellee,**

v.

**Gino MAESTAS, Defendant and Appellant.**

**No. 20000094.**

Supreme Court of Utah.

Dec. 20, 2002.

Mark L. Shurtleff, Att'y Gen., Kenneth A. Bronston, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Scott C. Williams, Joan C. Watt, Salt Lake City, for defendant.

DURHAM, Chief Justice:

¶ 1 We granted Gino Maestas's petitions for interlocutory appeal from two pre-trial orders. The first order denied Maestas's motion to present expert testimony concerning eyewitness identification. The second concerned a previous trial on the same charges in which Maestas had been convicted of aggravated robbery, but his convictions were reversed on appeal. The district court granted the state's motion to introduce in the second trial Maestas's statements from his presentence report and his allocution from the first trial.

¶ 2 The following opinion is divided. As to the admission of expert testimony, a majority of the court—Associate Chief Justice Durrant with Justice Wilkins concurring and Justice Russon with Justice Howe concurring—holds that the trial court did not abuse its discretion in denying defendant's motion for the admission of expert testimony. Chief Justice Durham dissents.

¶ 3 As to the admission of defendant's inculpatory statements from his first trial, a majority of the court holds that such statements are inadmissible, and therefore reverses the trial court's ruling. There is unanimous agreement on the inadmissibility of the defendant's inculpatory statements contained in his presentence report. Regarding the inadmissibility of the defendant's allocution statement, Justice Russon and Justice Howe concur with Chief Justice Durham that it is inadmissible, but for different reasons. Associate Chief Justice Durrant and

# 623

Justice Wilkins dissent as to the inadmissibility of the allocution statement.

## BACKGROUND

¶ 4 On the evening of February 20, 1995, two robberies were reported near downtown Salt Lake City.[1] The first occurred at a Top Stop convenience store shortly after 8:00 p.m. The robber, dressed in a two-tone blue jacket and wearing a dark mask covering the lower part of his face, confronted a store clerk with a gun and demanded money. The robber took between thirty and forty dollars from the cash register and six dollars from the clerk's wallet. The store clerk reported that the robber jogged to a car parked approximately one block away. The clerk was unsure about his description of the car due to the rainy weather conditions and poor lighting, but thought it was a gold-colored, mid–1980's model Camaro.

¶ 5 Sometime between eight-thirty and nine on the same evening, a similarly-dressed person entered a Pizza Hut and robbed several persons. The robber took between $160 and $170 from the cash register, including approximately $10 in change, $15 to $20 from one employee, $6 from another employee, a day-planner pouch containing $15 in bills and change from one of the customers, and several crumpled dollar bills from another customer. The robber demanded that two other employees surrender their wedding rings, but they refused to do so. None of the victims of the robbery saw how the robber left the area, but a witness outside the Pizza Hut informed police that someone had driven from the parking lot in a blue 1977 or 1978 Camaro.[2]

¶ 6 At approximately nine p.m., an officer investigating the Pizza Hut robbery noticed Gino Maestas's (Maestas) blue 1978 Camaro parked in the driveway of an apartment building approximately three-and-a-half blocks from the Pizza Hut. The officer discovered the car's hood was still warm and

that it contained a blue and green jacket and a few crumpled dollar bills. Watching from across the street, the officer observed Maestas and a friend, Mary Sisneros (Sisneros), come out of the apartment building and drive away in the Camaro. Shortly thereafter, police converged on the Camaro and arrested Maestas.

¶ 7 At trial, Maestas testified in his own defense. He asserted he had not committed the robberies, maintaining he had been at a family party at Sisneros's residence from about 5:30 p.m. until the time he and Sisneros attempted to go to a store but were stopped by the police. Although the robber wore a hat and mask over his mouth and nose, several witnesses positively identified Maestas at trial. Defense counsel did not request that the trial court give a cautionary instruction concerning the reliability of eyewitness identification testimony.

¶ 8 The jury convicted Maestas of eight counts of aggravated burglary. Prior to sentencing, as part of the presentence investigation, Maestas handwrote a "Statement of the Offense" for an Adult Probation and Parole (AP & P) investigator. In his statement, Maestas admitted committing the robberies and provided several details not adduced at trial: he stated he committed the robberies to get money "to get high" and that he used a toy gun. Maestas's statements were included in the presentence investigation report (presentence report).

¶ 9 The sentencing matrix in the presentence report indicated a prison sentence of seven years for each of the eight counts. When asked by the sentencing judge if he had anything to say before sentence was pronounced, Maestas, unaware that he would successfully appeal his convictions and win a new trial based on ineffective assistance of counsel, took the court's invitation to explain something about who he is and how he came to be in his unhappy situation. Specifically,

1. We present an abbreviated version of the facts in this case. For a more detailed version, the reader is referred to our opinion in *State v. Maestas*, 1999 UT 32, ¶¶ 2–19, 984 P.2d 376 ("*Maestas I*").

2. Neither this witness, nor the officer with whom the witness spoke, testified. A backup officer testified that the officer had told him of the witness's description of the car. In addition, another officer testified that there had been a police broadcast that the suspect may be in a "1978 or late 1970s model" blue Camaro.

he talked about his involvement with drugs, and stated "I wasn't going to hurt anybody .... I would like some leniency from the court on that. [Fifty-six] years, that's my whole life in prison. I can be changed. I have showed that before." During the course of his statement, Maestas said that he committed the robberies and that he felt remorse for the victims.

¶ 10 The court then sentenced Maestas to five years to life for each of the eight counts of aggravated robbery, and added a firearm enhancement of one year to each count. In addition, the court ruled that count I, arising from the Top Stop robbery, and count II, arising from the robbery of one of the individuals at Pizza Hut, would run consecutively. The remaining six counts, all arising from the Pizza Hut robberies, would run concurrently with counts I and II.

¶ 11 On appeal, we reversed Maestas's convictions, holding that he had received ineffective assistance of counsel at his trial. *Maestas I*, 1999 UT 32 at ¶¶ 32–37, 984 P.2d 376. Specifically, we held that "trial counsel's failure to request a cautionary eyewitness instruction ... [had] prejudiced Maestas." *Id.* at ¶ 37.

¶ 12 On remand to the district court for retrial, Maestas moved to suppress the eyewitness identifications provided by seven witnesses to the robberies. The court heard testimony from six of the seven witnesses and reviewed the testimony of all the witnesses in the transcripts of the first trial. With respect to three of the witnesses, the court granted Maestas's motion, concluding that the positive identifications provided by those witnesses were not sufficiently reliable. The court denied the motion as to the four remaining witnesses.

¶ 13 Maestas and the state also submitted a number of pre-trial motions to admit evidence. Specifically, Maestas moved to allow expert testimony relative to eyewitness identification and moved to suppress the inculpatory statements he made prior to sentencing in the first trial. The state moved to admit the statements. The court denied Maestas's motion to present expert testimony regarding the reliability of the eyewitness identifications, ruling that a jury instruction could

sufficiently inform the jury of "concerns about and factors affecting accuracy of eyewitness identification." The court further concluded that "allowing an expert to testify on the unreliability of eyewitness testimony would have a significant tendency to cause the jury to abdicate its role as a fact finder."

¶ 14 With respect to inculpatory statements from the sentencing phase of his first trial, Maestas argued that admission of those statements on retrial would compromise his rights to allocution and appeal, would violate his Fifth Amendment right against self-incrimination, and would violate rule 24(d) of the Utah Rules of Criminal Procedure. The trial court rejected Maestas's arguments and ruled that his inculpatory statements were admissible on retrial in the prosecution's case-in-chief.

¶ 15 Maestas petitioned this court for permission to appeal both the order denying permission to present expert testimony and the order admitting his inculpatory statements from the presentence report and the sentencing hearing. The state concurred in this petition, and we granted Maestas permission to appeal both interlocutory orders.

## ANALYSIS

¶ 16 We first note the scope of our review on interlocutory appeal. *See* Utah R.App. P. 5(e). We agreed to review the court's denial of Maestas's motion to admit expert testimony and the court's grant of the state's motion to admit evidence of Maestas's statements to AP & P and to the trial court at the time of sentencing. We do not address the court's decisions relating to the admissibility of specific witnesses' identifications of Maestas.

## I. MAESTAS'S MOTION TO PRESENT EXPERT TESTIMONY ON EYEWITNESS IDENTIFICATIONS

¶ 17 The first issue presented by Maestas is whether the trial court erred in refusing to allow expert testimony regarding eyewitness identifications. The court held that four of the eyewitnesses to the robberies will be permitted to testify that Maestas is the person who committed the robberies. As to the

other eyewitnesses, the court held that they be allowed to relate other details of the robberies that they observed. Maestas argues that because the eyewitness identifications are critical to the state's case, the trial court erred in ruling that he cannot present the expert testimony of Dr. David Dodd concerning the reliability of eyewitness identification testimony.

¶ 18 Concerns about eyewitness testimony were central to our holding in *Maestas I*, where we noted that prior cases "have summarized the empirical studies questioning the reliability of eyewitness identification." 1999 UT 32 at ¶ 25, 984 P.2d 376. Specifically, in *State v. Long*, we observed that "[t]he studies all lead inexorably to the conclusion that human perception is inexact and that human memory is both limited and fallible." 721 P.2d 483, 488 (Utah 1986). In connection with the first trial, we held that Maestas's counsel rendered ineffective assistance by failing to take action to educate the jury about the limitations on the reliability of eyewitness identifications. *Maestas I*, 1999 UT 32 at ¶ 30, 984 P.2d 376. In *Maestas I*, we explained that expert testimony was a possible method by which Maestas's attorney might educate the jury regarding the limitations of eyewitness identifications. *Id.* We held that in the absence of a legitimate tactical basis for refusing to do so, effective assistance requires, *at a minimum*, that defense counsel request a cautionary instruction. *See id.* at ¶¶ 32, 37.

¶ 19 Maestas now asserts that he cannot receive a fair trial without presenting expert testimony on the credibility of eyewitness identification. I agree, and would reverse as to this issue. The general rule for admissibility of expert testimony is set out in rule 702 of the Utah Rules of Evidence which conditions the admissibility of expert testimony on whether it "will assist the trier of fact to understand evidence or to determine a fact in issue" or will be "helpful to the finder of fact." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993). With regard to the admissibility of expert testimony, "[t]he trial court has wide discretion ..., and such decisions are reviewed under an abuse of discretion standard." *Id.* (citations omitted). Under this

standard, we will not reverse a decision to admit or exclude expert testimony unless the decision "exceeds the limits of reasonability." *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794 (citation omitted).

¶ 20 In *Hollen*, this court held that the trial court's ruling excluding the expert's opinion did not exceed the "limits of reasonability," after placing the "trial court's decision in its proper context." *Id.* at ¶ 67. We considered that the expert was permitted to give extensive testimony regarding the factors affecting the reliability of eyewitness identifications, and was only limited in expressing his overall opinion on eyewitness identification. *Id.* at ¶¶ 67–68. Since the expert in *Hollen* had already been given an opportunity to educate the jury on the impact of eyewitness identification, we found that the trial court did not abuse its discretion. *Id.* at ¶ 69.

¶ 21 In *State v. Butterfield*, this court also upheld the exclusion of expert testimony because the expert's testimony "did not deal with the specific facts" of the case, but "would constitute a lecture to the jury about how it should judge the evidence." 2001 UT 59, ¶ 44, 27 P.3d 1133. In *Butterfield*, the expert was not familiar with the defendant or the facts of the case and he would only have outlined for the jury the general principles of psychological knowledge which illuminate the problems of eyewitness performance. *Id.* In addition, there was "no showing that the excluded evidence would probably have had a substantial influence in bringing about a different verdict." *Id.* at ¶ 43 (quoting *State v. Malmrose*, 649 P.2d 56, 61 (Utah 1982)).

¶ 22 The circumstances of this case differ from those in *Butterfield* and *Hollen*. Unlike in *Hollen*, where the trial court allowed the expert on eyewitness testimony to testify about the factors that affect the reliability of identifications, the trial court here did not allow an expert on eyewitness testimony to testify at all. The expert was not allowed to give any testimony about the factors that affect the reliability of identifications, or relate his knowledge gained after examining specific facts from this case. In addition, unlike in *Butterfield* where the expert was not familiar with the facts of the case, Dr.

Dodd plans to testify about the factors specific to the Maestas case that could influence the accuracy of an eyewitness. Before testifying, Dr. Dodd would review police reports, eyewitness transcripts from preliminary hearings, photo spreads or pictures of line-ups, and then review the research most relevant to this case. While in *Butterfield,* where the excluded evidence would not have a substantial influence in bringing about a different verdict, here it might have a substantial influence because the prosecution's case rests almost exclusively on eyewitness testimony. The lower court has already concluded that all other evidence in this case, aside from the eyewitness testimony, is inconclusive or weak, especially given the gaps left unfilled by evidence of what the police officers did *not* find in defendant's possession. *Maestas I,* 1999 UT 32 at ¶¶ 29–31, 34–36, 984 P.2d 376. The prosecution's case thus rests on eyewitness testimony, and the jury's consideration of guilt or innocence will depend on the weight they give to this testimony, including how accurate they view the testimony to be. Thus, in my view, offering an expert's testimony regarding the reliability of the eyewitness testimony in this case is particularly crucial for the fact finder.

¶ 23 Finally, in *State v. Long* this court warned that "research has convincingly demonstrated the weaknesses inherent in eyewitness identification[; however,] jurors are, for the most part, unaware of these problems." 721 P.2d 483, 490 (Utah 1986). The *Long* instruction itself, while better than no education at all, can only give the jury general information, which itself only comes after all the evidence is in. Expert testimony, targeted to the specific evidence in the case, will be far more helpful to the jury in considering whether witnesses are in fact correct in identifying a particular defendant as a perpetrator. Recent experience with the re-examination of evidence in capital and other felony cases, using new DNA identification techniques, has conclusively established that eyewitnesses can be mistaken, for many reasons that are beyond the general knowledge and experience of the average juror. *See* Gary L. Wells, *http:www.psychology.iastate.edu/faculty/gwells/homepage.htm* (summarizing seven recent Associated Press articles exam-

ining the wrongful convictions of 110 inmates who were exonerated by the use of DNA testing; their collective prison time exceeded 1,000 years). Jurors, as well as defendants, are entitled to the information experts on human memory can provide about its operation. Although the weaknesses of eyewitness identification will not warrant automatic allowance of eyewitness experts in all cases, given all the factors in this case, expert testimony will act to clarify eyewitness testimony and ensure that Maestas receives a fair trial.

¶ 24 In light of our holdings in *Hollen, Butterfield* and *Long,* I would therefore hold that defendant's expert must be allowed to testify at trial.

## II. ADMISSION OF MAESTAS'S INCULPATORY STATEMENTS FROM THE SENTENCING PHASE OF HIS FIRST TRIAL

¶ 25 Maestas next challenges the trial court's order allowing the prosecution to admit inculpatory statements he made following his first trial in his presentence report and at the sentencing hearing. We address first the admissibility of Maestas's statements in his presentence report, concluding that the provisions of the Utah Code governing the release of presentence reports preclude disclosure of Maestas's statements contained within the report. We then address the admissibility of Maestas's statement at the sentencing hearing, concluding that the statement is inadmissible.

### A. Admissibility of the Presentence Report

¶ 26 After being convicted of the robberies at his first trial, Maestas hand-wrote his version of the robberies on a "Statement of the Offense" form, which was then included as part of the presentence report. In his statement, Maestas admitted to robbing the "restaurant" and "gas station."

¶ 27 After Maestas was granted a new trial in *Maestas I,* the prosecution sought to admit his statements from his presentence report during the new trial. Because the trial court concluded that "nothing in the record suggest[ed] that defendant's written statement

... was not voluntary," the trial court ruled that the prosecution could admit the incriminating statements from this report as part of its case-in-chief.

¶ 28 Maestas appeals this ruling, raising several constitutional and statutory claims. In particular, Maestas contends that admission of the statements from his presentence report would violate (1) his Fifth Amendment privilege against self-incrimination; (2) his right to allocute and appeal; (3) subsection 77–18–1(5)(d) (1999)[3] of the Utah Code, which Maestas claims makes presentence reports unavailable for purposes other than sentencing; and (4) subsection 4–202.02(6)(C) of the Utah Rules of Judicial Administration, which requires that presentence reports be treated as controlled judicial records. Because we conclude that section 77–18–1 and related statutes preclude admission of the presentence report, we focus exclusively on this aspect of Maestas's argument.

¶ 29 Section 77–18–1 delineates, inter alia, the preparation and disclosure requirements for presentence reports. Subsection 77–18–1(5) deals specifically with the Department of Corrections's responsibilities in preparing the report:

(5) (a) Prior to the imposition of sentence, the court may, with the concurrence of the defendant, continue the date for the imposition of the sentence for a reasonable period of time for the purpose of obtaining a presentence investigation report from the [D]epartment [of Corrections] . . . .

(b) The presentence investigation report shall include a victim impact statement . . . .

(c) The presentence investigation report shall include a specific statement of pecuniary damages . . . .

(d) The contents of the presentence investigation report . . . are not available except by court order for purposes of sentencing

as provided by rule of the Judicial Council or for use by the department.

Utah Code Ann. § 77–18–1(5) (Supp.2001). Maestas relies on subsection 77–18–1(5)(d) to argue that his presentence report is "available for purposes of sentencing" only and thus inadmissible in the prosecution's case-in-chief.

■ ¶ 30 As discussed below, Maestas overlooks the fact that the disclosure limitations specified in section 77–18–1(5)(d) are replaced by less stringent limitations once a presentence report has been completed and reviewed for accuracy. Subsection 77–18–1(5), as we have noted, deals with the *preparation* of the report. The fact that subsection (5)(d)'s strict disclosure limitation falls within a subsection focusing exclusively on the report's preparation indicates that the legislature intended that the limitation apply only to the preparation phase of the report.

¶ 31 Strict access control during the report's preparation apparently arose out of the legislature's concerns over releasing possibly inaccurate information. During the preparation phase, the parties have not had an opportunity to challenge the report's accuracy. This opportunity comes once the Department of Corrections completes its preparation of the report, as shown in subsection 77–18–1(6):

(6) (a) The department shall provide the presentence investigation report to the defendant's attorney, or the defendant if not represented by counsel, the prosecutor, and the court for review, three working days prior to sentencing. Any alleged inaccuracies in the presentence investigation report, which have not been resolved by the parties and the department prior to sentencing, shall be brought to the attention of the sentencing judge, and the judge may grant an additional ten working days to resolve the alleged inaccuracies of the report with the department. If after ten

---

**3.** Although the robberies were allegedly committed in 1995, Maestas cites the 1999 version of section 77–18–1. Because the relevant portions of the current versions of section 77–18–1 and 63–2–202 are substantially identical to the versions in effect at the time of the alleged robberies, we cite the most current official code supplement. In this regard, we note that prior to the

deletion in 2001 of a subsection dealing with restitution, a topic irrelevant to our analysis, subsection 77–18–1(14), which we later cite in this opinion, was formerly subsection 77–18–1(15). *See* H.B. 26, 54th Leg., Gen. Sess., 2001 Utah Laws 699–702; *compare* Utah Code Ann. § 77–18–1(14) (Supp.2001), with Utah Code Ann. § 77–18–1(15) (1994).

working days the inaccuracies cannot be resolved, the court shall make a determination of the relevance and accuracy on the record.

(b) If a party fails to challenge the accuracy of the presentence investigation report at the time of sentencing, that matter shall be considered to be waived.

Utah Code Ann. § 77–18–1(6) (Supp.2001).

¶ 32 After completion of the review detailed in subsection 77–18–1(6), the information in a presentence report is presumptively accurate. The report is then used to inform the court's decision regarding the proper sentence.

¶ 33 Subsection 77–18–1(14) then addresses the disclosure limitations on the completed and presumptively accurate reports. Significantly, despite classifying the reports as "protected" under the Government Records Access and Management Act, subsection 77–18–1(14) lists five conditions under which the report may be disclosed for purposes other than sentencing:

(14) Presentence investigation reports, including presentence diagnostic evaluations, are classified protected in accordance with Title 63, Chapter 2, Government Records Access and Management Act. Notwithstanding Sections 63–2–403 and 63–2–404, the State Records Committee may not order the disclosure of a presentence investigation report. Except for disclosure at the time of sentencing pursuant to this section, the [D]epartment [of Corrections] may disclose the presentence investigation only when:

(a) *ordered by the court pursuant to Subsection 63–2–202(7)*;

(b) requested by a law enforcement agency or other agency approved by the department for purposes of supervision, confinement, and treatment of the offender;

(c) requested by the Board of Pardons and Parole;

(d) *requested by the subject of the presentence investigation report or subject's authorized representative;* or

(e) requested by the victim of the crime discussed in the presentence investigation

report or the victim's authorized representative, provided that the disclosure to the victim shall include only information relating to statements or material provided by the victim, to the circumstances of the crime including statements by the defendant, or to the impact of the crime on the victim or the victim's household.

*Id.* § 77–18–1(14) (emphasis added).

¶ 34 Of particular relevance to the trial court's order in this case is subsection 77–18–1(14)(a), which provides that the Department of Corrections may disclose presentencing reports "when ordered by the court pursuant to Subsection 63–2–202(7)." *Id.* Based on subsection 77–18–1(14)(a), Maestas's presentence report is subject to court-ordered disclosure if the order complies with subsection 63–2–202(7).

¶ 35 We thus turn to subsection 63–2–202(7) to determine whether the trial court properly ordered disclosure of Maestas's presentence report for use in the prosecution's case-in-chief. Subsection 63–2–202(7) of the Utah Code falls within a statute entitled, "Access to private, controlled, and protected records." Utah Code Ann. § 63–2–202 (Supp.2001). Subsection 63–2–202(7) deals specifically with the conditions governing access to such records based on a "court order signed by a judge from a court of competent jurisdiction." *Id.* § 63–2–202(7).

¶ 36 By its terms, subsection 63–2–202(7) places several conditions on court-ordered disclosure of presentence reports:

(7) A government entity shall disclose a record pursuant to the terms of a court order signed by a judge from a court of competent jurisdiction, provided that:

(a) the record deals with a matter in controversy over which the court has jurisdiction;

(b) the court has considered the merits of the request for access to the record; and

(c) the court has considered and, where appropriate, limited the requester's use and further disclosure of the record in order to protect ... privacy interests or the public interest in the case of other protected records;

(d) to the extent that the record is properly classified ... protected, the interests favoring access, considering limitations thereon, outweigh the interests favoring restriction of access; and

(e) where access is restricted by ... statute ... referred to in Subsection 63–2–201(3)(b), the court has authority independent of this chapter to order disclosure. *Id.* § 63–2–202(7).

¶ 37 Since the trial court apparently was not made aware of subsection 78–1–18(15) or its reference to subsection 63–2–202(7), the court reached no conclusion with respect to subsection 63–2–202(7)'s conditions regarding court-ordered disclosure. In addition, neither Maestas nor the state advances any arguments with respect to these conditions.

¶ 38 Based on our analysis, we conclude that, as a matter of law, disclosure of the report does not satisfy the requirements of subsection 63–2–202(7). Specifically, the circumstances in this case meet only three of the five conditions enumerated in subsection 63–2–202(7):

(1) Maestas's admissions concerning the robberies in his presentence report "deal[ ] with a matter in controversy over which the [trial] court has jurisdiction." *Id.* § 63–2–202(7)(a);

(2) by granting the state's request for disclosure, the court apparently "considered the merits of the request for access to" Maestas's statements in the report. *Id.* § 63–2–202(7)(b); and

(3) although "access to [the report] is restricted by a ... statute [i.e., section 77–18–1]," subsection 77–18–15(a) allows for disclosure by court order and gives courts "authority independent of ... chapter [2] to order disclosure." *Id.* § 63–2–202(7)(e).

¶ 39 We are not satisfied, however, that the two remaining conditions specified by section 63–2–202 are met. First, there is no evidence that the court "considered and, where appropriate, limited the requester's use and further disclosure of the record in order to protect ... privacy interests or the public interest." *Id.* § 63–2–202(7)(c). Indeed, rather than considering more limited

uses of the report (e.g., disclosure only for impeachment purposes), the court ordered that the requester (i.e., the prosecution) could publicly disclose Maestas's statements during its case-in-chief.

■ ¶ 40 Second, we conclude that even limited disclosure of the presentencing report is unwarranted. In particular, subsection 63–2–202(7)(d) requires that the interests favoring the permitted scope of access outweigh the interests favoring restriction of access before disclosure is ordered. We believe that the exclusion of the presentence report in the prosecution's case-in-chief is supported by the same concerns laid out hereafter in our analysis. Briefly, a defendant's statements repeated in a presentence report are functionally equivalent to his statements at sentencing in that they are both made pursuant to his right to petition the court for mercy. We conclude that any interest favoring access to the presentence report by the state are outweighed by Maestas's legislatively-recognized privacy interest in the records.

¶ 41 Under the circumstances, we hold that the interests favoring non-disclosure prevail. Accordingly, we reverse the trial court's order allowing the prosecution to admit in its case-in-chief Maestas's statements in his presentence report. Having determined that the Utah Code is dispositive of the issue, we need not reach Maestas's arguments under the federal or state constitution or the Utah Code of Judicial Administration.

### B. Admissibility of the Allocution

■ ¶ 42 We next turn to the question of whether the trial court erred in ruling admissible Maestas's allocution statement. Maestas contends admission of the statement violates his right to be placed in "the same position" on retrial under rule 24(d) of the Utah Rules of Criminal Procedure. We conclude that rule 24(d) requires exclusion of Maestas's allocution from the prosecution's case-in-chief in the retrial.[4]

¶ 43 Maestas contends that his allocution statements are inadmissible on retrial under

4. We do not reach Maestas's federal constitutional arguments.

rule 24(d) of the Utah Rules of Criminal Procedure. We briefly note the context of rule 24(d) before detailing the specifics of Maestas's argument. Rule 24(d) falls within a rule entitled, "Motion for a new trial." After rules 24(a) through 24(c) detail the authority and procedures for a motion for a new trial, rule 24(d) provides that "[i]f a new trial is granted, the party shall be in the same position as if no trial has been held and the former verdict shall not be used or mentioned either in evidence or argument." [5]

¶ 44 Citing the language of rule 24(d), Maestas argues that he would not be "in the same position as if no trial had been held" if his allocution statements were used at his new trial. Maestas allows for the possibility that rule 24(d) directly applies only to a new trial arising from a *motion*, and not to a new trial arising from his successful *appeal*, but contends that even if rule 24(d) is limited to a new trial arising from a motion, "due process and equal protection" require that a defendant receive the same protections when the new trial arises from an appeal.

¶ 45 We decline to decide whether rule 24(d) applies to new trials after appeal [6] because the parties have inadequately briefed this issue, and resolving it is unnecessary in this case. Instead, we rely on our supervisory powers to craft an analogous rule applicable here. As a matter of policy, we see no reason to treat the admissibility of evidence concerning a prior verdict differently depending on whether an accused receives a new trial through a motion or through an appeal. Accordingly, we use the language of rule 24(d) as a guide to the admissibility of Maestas's allocution statements.

1. Allocution Under the Common Law and Utah Law

¶ 46 At common law, allocution was the formal inquiry of one already convicted of a capital or treasonous offense before passing sentence; it was used to determine if a legal cause would prevent the sentence's execution. *See* Caren Myers, Note, *Encouraging Allocution at Capital Sentencing: A Proposal for Use Immunity*, 97 Colum. L.Rev. 787,

5. In its entirety, rule 24 provides:
> Rule 24. Motion for a new trial.
> (a) The court may, upon motion of a party or upon its own initiative, grant a new trial in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party.
> (b) A motion for a new trial shall be made in writing and upon notice. The motion shall be accompanied by affidavits or evidence of the essential facts in support of the motion. If additional time is required to procure affidavits or evidence the court may postpone the hearing on the motion for such time as it deems reasonable.
> (c) A motion for a new trial shall be made within 10 days after imposition of sentence, or within such further time as the court may fix during the ten-day period.
> (d) If a new trial is granted, the party shall be in the same position as if no trial had been held and the former verdict shall not be used or mentioned either in evidence or in argument.
> Utah R.Crim. P. 24.

6. We note that, over one hundred years ago, the United States Supreme Court directly applied a Utah territorial statute similar in language to rule 24(d) to a trial after a successful appeal. *Hopt v. Utah*, 120 U.S. 430, 442, 7 S.Ct. 614, 30 L.Ed. 708 (1887) (applying to new trial after reversal a Utah territorial regulation that provided that " 'the granting of a new trial places all the parties in the same position as if no trial had been had,' and 'all the testimony must be produced anew, and the former verdict cannot be used or referred to either in evidence or argument' ") (quoting 1878 Utah Laws, § 317). With the evolution of the "law of the case doctrine," and the current structure of the Utah Rules of Criminal Procedure, the "same position" language is likely not equally applicable to retrials after successful appeal.

Under the "law of the case doctrine," a defendant's legal "position" will often differ depending on how the defendant received a new trial. Specifically, a successful appellee may begin a new trial in a significantly different "position" than that at the original trial, since an appellate court's legal rulings generally bind a lower court on retrial. *See* 58 Am.Jur.2d. *New Trial* § 590 (1989). This reality makes us hesitant to construe rule 24(d) to apply equally to new trials granted upon motion and new trials granted upon appeal.

The structure of the rules also suggest a contrary intent. Rule 24 is entitled, "Motion for new trial" and the first three subsections deal specifically with the guidelines for a motion for a new trial and make no mention of appeal. From this context, then, it appears that rule 24(d)'s preamble, "If a new trial is granted" refers only to situations following a successful motion. Moreover, rule 28, entitled "Disposition after appeal," neither refers back to 24(d) nor includes similar language.

798–99 (1997). The standard question asked was, "Do you know of any reason why judgment should not be pronounced upon you?" *See* Paul W. Barrett, *Allocution,* 9 Mo. L.Rev. 115, 115 (1944). As the practice of allocution developed, it took on a less formalistic character, becoming also a means for the defendant to request understanding and mercy. *See* 1 Joseph Chitty, *A Practical Treatise on the Criminal Law* 700 (photo. reprint 1978) (London, A.J. Valpy 1816).

¶ 47 Even prior to the writing and adoption of our state constitution, Utah territorial law required the physical presence of a convicted felon at sentencing. Compiled Laws of Utah, Code of Criminal Procedures, Title VII, § 5102 s 326 (1888). If a defendant did not appear for sentencing after being released on bail, and was subsequently brought to court pursuant to a bench warrant, defendant had to "be asked whether he has any legal cause to show why judgment should not be pronounced against him." *Id.* at § 5108 s 332. Subsequently, the Utah Constitution guaranteed a defendant "the right to appear and defend *in person."* Utah Const., art. I, § 12. Thus, from the beginning of the development of this state's criminal procedures, a high value was placed on a defendant's availability and opportunity to speak at trial and sentencing.

 ¶ 48 Allocution is an "inseparable part" of the right to appear and defend in person guaranteed by the Utah Constitution. *State v. Anderson,* 929 P.2d 1107, 1109–10 (Utah 1996). This court has previously addressed allocution, literally "[a] speaking to [or] addressing[,]" 1 Oxford English Dictionary, 236 (1961), under article I, section 12 of the Utah Constitution in *State v. Young,* 853 P.2d 327, 358–59 (Utah 1993) (convicted person denied allocution before sentencing phase for aggravated murder where death penalty requested by the state). In *Young,* the court considered whether allocution is constitutionally guaranteed, but decided that it did not have to answer that question to resolve the claim raised. Three years later in *Anderson,* reviewing a convicted person's voluntary absence from his sentencing, we stated that under article I, section 12 of the Utah constitution:

> Utah Rule of Criminal Procedure 22 implements *the constitutional right* [of allocution], providing:
>
> (a) . . . .
>
> Before imposing sentence the court shall afford the defendant an opportunity to make a statement and to present any information in mitigation of punishment, or to show any legal cause why sentence should not be imposed.

*State v. Anderson,* 929 P.2d at 1109–10 (emphasis added) (quoting Utah R.Crim. P. 22(a)). While *Anderson* concluded that the defendant had voluntarily waived his right to be present, it nonetheless affirmed the existence of a right to allocution: "The right to allocution is nowhere specifically granted in . . . the state . . . constitution. It is an *inseparable part of the right to be present."* *Id.* at 1111 (emphasis added). Thus, in *Anderson,* this court clearly and thoughtfully recognized a constitutionally guaranteed right to allocution.

¶ 49 The right to allocution would be meaningless if a convicted person's allocution statements could be used against him or her in a subsequent prosecution. Under such a rule, a competent attorney would almost always advise the client against allocuting, at least in any case in which an appeal is contemplated. *See Myers* at 789 n. 9. Trial judges would have to inform defendants at allocution that their statements could be used against them at any retrial. It is not likely that defendants would be willing to make any incriminating admissions after such a warning.

¶ 50 This case need not turn on constitutional questions, however, because the policy embodied in rule 24(d) is determinative.[7]

## 2. Admissibility Under Rule 24(d)

¶ 51 Rule 24(d) of the Utah Rules of Criminal Procedure provides:

---

7. *See* Hans A. Linde, *First Things First: Rediscovering the States' Bills of Rights,* 9 U. Balt. L.Rev. 379, 390 (1980) (stating dispositive rules or statutes should be treated before constitutional analysis).

If a new trial is granted, the party *shall be in the same position as if no trial had been held* and the former verdict shall not be used or mentioned either in evidence or in argument.[8]

Utah R.Crim. P. 24 (emphasis added).

¶ 52 Our court has held that "[w]hen interpreting statutes, our primary goal is to evince 'the true intent and purpose of the Legislature.' " *Utah v. Tooele County*, 2002 UT 8, ¶ 10, 44 P.3d 680 (citing *Jensen v. Intermountain Health Care, Inc.*, 679 P.2d 903, 906 (Utah 1984)). The plain language of the statute provides us with the road map to the statute's meaning, helping to clarify the intent and purpose behind its enactment. *Id.* (citations omitted). When reading the statutory language, our purpose is "to render *all parts* [of the statute] relevant and meaningful," *id.* (emphasis added) (citing *Millett v. Clark Clinic Corp.*, 609 P.2d 934, 936 (Utah 1980)), and thus, we "presume the legislature use[d] each term advisedly and . . . according to its ordinary meaning." *Id.* (citing *Nelson v. Salt Lake County*, 905 P.2d 872, 875 (Utah 1995)). As a result, we "avoid interpretations that will render portions of a statute superfluous or inoperative." *Id.* (citing *Hall v. Utah State Dep't of Corr.*, 2001 UT 34, ¶ 15, 24 P.3d 958) (other citation omitted).

¶ 53 As is the case in construing statutes, this court's rules of practice and procedure require close attention to their exact language. "It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute . . . . No clause[,] sentence or word shall be construed as superfluous, void or insignificant if the construction can be found which will give force to and preserve all the words of the statute." Norman J. Singer, 2A *Sutherland Statutory Construction* § 46:06 (4th ed.1984). Therefore, our analysis of rule 24 should begin by giving meaning to the first part of the rule requiring that a party must be placed "in the same position as if no trial had been held[,]" after the vacation of a conviction. This language is critical; rule

24(d) is written in the conjunctive, thus making clear that it has two separate requirements—the defendant must be placed in the same position *and* the prior verdict must not be mentioned. The language in no way indicates that specific mention of the verdict, the most obvious but clearly not the only item that the prosecution might want to admit as the direct result of the first trial, is the only thing that must be avoided at a new trial. Obviously, for example, other aspects of the first trial, including references to who testified, to objections made or waived, or to the judge's rulings, would be forbidden by the rule, even though such references would not mention the "verdict." Generally, it will not be possible to allude in any way to the first trial without raising questions about the verdict. Thus, a problem exists regarding the context for use of allocution statements at the retrial. That context will likely raise some questions in at least some jurors' minds as to how the statements came to be made.

¶ 54 Another important rule regarding "whole statute" interpretation, also relevant to the construction of procedural rules, states: "A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole." Singer, *supra*, § 96:05. Rule 24 permits a trial court to "grant a new trial in the interest of justice if there is any error or impropriety which had a substantial impact upon the rights of a party." Utah R.Crim. P. 24(a). Thus, the rule is an overall expression of the need to rectify any error in the trial process that significantly impacted a defendant's rights. In order to "harmonize" subpart (a) with subpart (d) of the rule, the phrasing of subpart (d) should be read to accomplish the overall goal of the rule as set out in subpart (a). Granting a defendant a new trial because of a significant denial of his or her rights during the first trial, but then penalizing the same defendant for the exercise of a constitutional and statutory right to

---

8. This language derives from the laws of pre-statehood Utah. *See Hopt v. Utah*, 120 U.S. 430, 432, 7 S.Ct. 614, 30 L.Ed. 708 (1887) (quoting 1878 Utah Laws, § 317). Whatever the rule's

intent, it has been important to the criminal procedure practice of this state for a very long time.

allocution, violates the spirit and the letter of rule 24. *See Harvey v. State*, 835 P.2d 1074, 1135 (Wyo.1992) (Golden, J., concurring in part and dissenting in part) (arguing in dissent that key goal of sentencing is basing punishment on humanitarian principles, with allocution playing role of allowing the convicted person to influence the sentence given. "If the conviction and sentence are reversed on appeal and the defendant once again put in jeopardy, why should not the parties return to the level playing field, neither side having gained an unfair advantage as a result of the process?").

¶ 55 Allocution has long played an important role in sentencing following conviction, perhaps as much for psychological as for legal reasons. There are significant differences between the fact-finding and sentencing aspects of a trial. As Justice Powell has stated, "The sentencer's function is not to discover a fact, but to mete out just deserts [sic] as he sees them." *Bullington v. Missouri*, 451 U.S. 430, 450, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) (Powell, J., dissenting) (capital case). The Hebrew High Holiday liturgy provides an apt example of the role allocution plays in judgment. After confession of individual and communal wrongs, the supplicants beseech God to deal with them compassionately, requesting mercy even though they have no worthy deeds to present to the judge. ("Avinu Malkeinu," *Mahzor for Rosh Hashana and Yom Kippur*; the Rabbinical Assembly, United Synagogue of America, 750–52 (Rabbi Jules Harlow ed., 1997 printing)). That even the guilty may plead for mercy or compassion is fundamental to our legal system. As rule 24 recognizes, after a conviction is set aside, a defendant is entitled to be restored to the circumstances existing before the trial, including the right to remain silent and force the state to convict him on the facts it can establish independent of his admissions at sentencing.

¶ 56 We acknowledge the dilemma faced by the system here: Why should a defendant be able to seek the benefits of a confession at allocution, but avoid the costs at retrial? On the other hand, should the exercise of the right to plead for mercy deprive a defendant who has been unlawfully convicted of a clean slate at his or her retrial? On balance, we conclude that it is better to permit a defendant to freely exercise his right to petition for mercy, however much he might be tempted to shade the tenor or accuracy of his remarks, than to require his petition to be made in the shadow of a future prosecution. In fact, the competing values and motives operating at trial and at sentencing create some doubt that confessions obtained at the latter will be entirely reliable. Most defense counsel and many defendants are well aware that claims of innocence, after a trial has resulted in an adjudication of guilt, are not only likely to fall on deaf ears, but also may offend or disturb the sentencer, who must consider factors such as a defendant's acceptance of personal responsibility and willingness to be rehabilitated. Furthermore, a defendant's attitude toward the crime for which he has been convicted, as reflected in his statement to the court at allocution, may also affect the way he is viewed and treated by the Board of Pardons and Parole if he is imprisoned. Finally, in some cases, defendants convicted of certain crimes are not even eligible for probation and treatment programs at sentencing unless they confess guilt. *See, e.g.*, Utah Code Ann. § 76-5-406.5(1)(h) (2001) (providing that court's discretion, defendant may have sentence suspended and be released to a residential sexual abuse center if, among other conditions, he "admits the offense of which he has been convicted."). It is not implausible that even an innocent person (and one, moreover, who has not received a fair trial and intends to challenge it on appeal) might falsely admit to a crime in order to obtain some advantage or leniency at sentencing. It seems fundamentally unfair to burden the right to plead for leniency at allocution with an automatic waiver of the right, on retrial, to require the state to prove guilt without the use of the contents of those pleadings.[9] Rule 24 was intended to

9. If the defendant testifies at retrial, however, he may be impeached by the use of statements made at the allocution. While it is unfair to use allocution statements to convict, it would not be unfair to use them to prevent a defendant from successfully committing perjury at a new trial.

preclude that result after a motion for a new trial, and we apply the same principle here.

## CONCLUSION

¶ 57 Again, we note that the opinion is divided. Regarding the admission of expert testimony, the majority of this court affirms the trial court's denial of Maestas's motion.

¶ 58 As to the second issue, regarding the district court's order permitting the state's introduction of Maestas's inculpatory statements from his presentence report and his allocution during the sentencing phase of his first trial, the majority of this court reverses the district court's order. Neither the presentence report nor statements from the allocution are admissible for use by the state in its case-in-chief.

¶ 59 We remand for proceedings consistent with this opinion.

DURRANT, Associate Chief Justice,
dissenting in part and concurring in part:

¶ 60 I respectfully dissent as to parts I and II.B of Chief Justice Durham's lead opinion. In part I, Chief Justice Durham would adopt a rule eliminating the trial court's discretion by requiring that expert witness testimony be admitted in cases where eyewitness identification is at issue. In my view, this rule is both unjustified and overly broad. In part II.B, she would create a new rule of criminal procedure that requires the suppression of all allocution statements made by defendants, including confessions. I believe that the lead opinion fails to offer adequate justification for such a new rule.

## ANALYSIS

### I. MAESTAS'S MOTION TO PRESENT EXPERT TESTIMONY ON EYEWITNESS IDENTIFICATIONS

¶ 61 I disagree with Chief Justice Durham's conclusion that Maestas's expert on witness identification "must be allowed to testify at trial." I consider this new rule an unjustified extension of our case law and inconsistent with rule 702 of the Utah Rules of Evidence. After reviewing our previous holding in this case, *State v. Maestas,* 1999 UT 32, 984 P.2d 376 (*Maestas I* ), the lead opinion reviews three prior decisions that addressed the issue of expert testimony on eyewitness identification. *See State v. Hollen,* 2002 UT 35, 44 P.3d 794; *State v. Butterfield,* 2001 UT 59, 27 P.3d 1133; *State v. Long,* 721 P.2d 483 (Utah 1986). However, neither these cases nor rule 702 mandates, as Chief Justice Durham suggests, a new rule removing judicial discretion and requiring admission of expert testimony on eyewitness identification.

### A. Our Prior Case Law Does Not Mandate a New Rule Requiring the Admission of Expert Testimony

¶ 62 Contrary to the view expressed in the lead opinion, other cases that have recently addressed the admission of eyewitness expert testimony do not support the conclusion that trial courts must allow expert testimony on eyewitness identification. Chief Justice Durham concludes that these cases, read in light of our holding in *Maestas I,* support a determination that the trial court abused its discretion when it refused to allow Maestas's expert to testify. However, a close examination of our case law provides no such support for this position.

¶ 63 Concerns about expert testimony on eyewitness identification were central to our holding in *Maestas I,* where we noted that our prior cases "have summarized the empirical studies questioning the reliability of eyewitness identification." 1999 UT 32 at ¶ 25, 984 P.2d 376 (citing *State v. Ramirez,* 817 P.2d 774, 779–80 (Utah 1991); *State v. Long,* 721 P.2d 483, 488–92 (Utah 1986)). Although we held that Maestas's counsel had rendered ineffective assistance by failing to educate the jury about the limitations of eyewitness identifications, we did not state that expert testimony was necessary for Maestas to receive a fair trial on remand. *Maestas I,* 1999 UT 32 at ¶ 30, 984 P.2d 376. Rather, we held that, in the absence of a legitimate tactical basis for refusing to do so, effective assistance requires, at a minimum, that defense counsel request a cautionary instruction. *Id.* at ¶¶ 32, 37. Although expert testimony is one method of educating the jury about the

pitfalls of eyewitness identifications, our comment in *Maestas I* should not be interpreted as depriving the trial court of its traditional discretion in this area.

¶ 64 Similarly, none of the cases relied on by Chief Justice Durham support the rule that expert testimony must be admitted in this case. In fact, our recent case law contradicts her conclusion by consistently upholding the trial court's discretion.

¶ 65 The lead opinion would create a rule entitling defendants "to the information experts on human memory can provide about its operation," relying on "our holdings in *Hollen, Butterfield* and *Long.*" However, *Long* only addressed whether giving a jury instruction on eyewitness identification was appropriate. 721 P.2d at 487–92. *Long* did not address the admissibility of expert testimony on eyewitness identification. While we concluded in *Long* "that, at a minimum," problems with eyewitness identifications warranted a special jury instruction, *id.* at 492, Chief Justice Durham now concludes that even more is mandated. However, our holding in *Long* recognizing the necessity of educating juries about the fallibility of eyewitness testimony does not justify the further conclusion that courts *must* admit expert testimony to provide that education.

¶ 66 Nor does *Butterfield,* 2001 UT 59, 27 P.3d 1133, support the creation of this new rule. In *Butterfield,* the trial court excluded the defendant's eyewitness identification expert's testimony for several reasons. In affirming that exclusion, we noted that the expert's testimony "did not deal with the specific facts from this case." *Id.* at ¶ 44. The lead opinion in the case at bar focuses on this language, reasoning that because the expert would deal with the specific facts a different conclusion is warranted. However, in *Butterfield* we also found that the trial court appropriately exercised discretion by excluding the expert because his testimony " 'would [amount to] a lecture to the jury as to how they should judge the evidence,' " *id.* at ¶ 43 (quoting *State v. Griffin,* 626 P.2d 478, 481 (Utah 1981)), and because the evidence "could cause confusion of the issues and could cause undue delay or waste of time during the trial." *Id.* at ¶ 44. Finally, we

upheld the trial court's exercise of discretion because "Butterfield ... made no showing that the proffered testimony would have had a substantial influence in bringing about a different verdict." *Id.; see also State v. Malmrose,* 649 P.2d 56, 61 (Utah 1982). Our holding "that the trial court did not abuse its discretion in excluding ... proposed expert testimony regarding eyewitness identification," *Butterfield,* 2001 UT 59 at ¶ 44, 27 P.3d 1133, does not support Chief Justice Durham's conclusion that defendants are entitled to expert testimony.

¶ 67 Chief Justice Durham also finds support for this rule requiring the admission of expert testimony by distinguishing our holding in *Hollen,* 2002 UT 35, 44 P.3d 794, from the circumstances in this case. In *Hollen,* the trial court allowed the defendant's eyewitness identification expert to give "extensive testimony on factors that affect the reliability of identifications" but prohibited the expert from testifying on the "overall reliability of the process of identification." *Id.* at ¶ 67. On review, this court concluded that the trial court appropriately exercised its discretion because the excluded testimony would not have been "helpful to the finder of fact." *Id.* at ¶ 69 (citations omitted). Chief Justice Durham finds that the case at bar differs from *Hollen* because the trial court "did not allow an expert on eyewitness testimony to testify at all." Based on the fact that this court affirmed the trial court's allowance of expert testimony in *Hollen,* Chief Justice Durham finds support for this new rule that expert testimony *must* be admitted in cases where eyewitness identification is central to the prosecution's case. Such a conclusion is unjustified. Our affirmation of a trial court's exercise of discretion to permit, with a limitation, an eyewitness expert's testimony does not justify, as Chief Justice Durham argues, a conclusion mandating the admission of expert testimony.

¶ 68 Even more recently, we have reviewed the exclusion of expert testimony on eyewitness identification and upheld the trial court's exercise of discretion. *See State v. Hubbard,* 2002 UT 45, 48 P.3d 953. In *Hubbard,* "the trial court gave a cautionary *Long* instruction instead of permitting expert testi-

mony regarding eyewitness identification." *Id.* at ¶ 19. Reviewing the trial court's exercise of discretion, we noted the following:

> We have not adopted a per se rule of inadmissibility of expert testimony regarding eyewitness identification. Instead, we recognize that whether to allow proffered expert testimony regarding eyewitness identification testimony is a matter best left to the trial court's discretion because of the trial court's superior position to judge the advisability of allowing such testimony.

*Id.* at ¶ 14. This recent decision emphasizes our determination to avoid the creation of a per se rule and to permit trial courts to exercise discretion when asked to admit expert testimony.

¶ 69 In sum, Chief Justice Durham's reliance on our case law to justify a new rule mandating the admission of expert testimony on eyewitness identification is unjustified. The cases cited in the lead opinion do not support the conclusion that trial courts must admit expert testimony. Rather, our case law validates the opposite conclusion—that trial courts may appropriately exercise discretion to exclude expert testimony.

### B. The Proper Application of Rule 702 Does Not Require the Admission of Expert Testimony

¶ 70 In concluding that expert testimony on eyewitness identification is required, Chief Justice Durham also misconstrues rule 702 of the Utah Rules of Evidence, which specifically governs the admissibility of expert testimony. *According to rule 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise."*

¶ 71 Interpreting rule 702, this court has established a three-part test to determine the admissibility of scientific evidence. *State v. Crosby,* 927 P.2d 638, 640–41 (Utah 1996);

State v. Rimmasch, 775 P.2d 388, 398–403 (Utah 1989). The test requires the trial court to (1) "determine whether the scientific principles and techniques underlying the expert's testimony are inherently reliable," (2) "determin[e whether] the scientific principles or techniques at issue have been properly applied to the facts of the particular case by sufficiently qualified experts," and (3) "determine whether the proffered scientific evidence will be more probative than prejudicial as required by rule 403 of the Utah Rules of Evidence." *Crosby,* 927 P.2d at 641.

¶ 72 With respect to a trial court's denial of a party's motion to present expert testimony under rule 702, we have held that "[t]he trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard." *State v. Larsen,* 865 P.2d 1355, 1361 (Utah 1993). Explaining further, we recently held that " 'the exercise of discretion ... necessarily reflects the personal judgment of the court and the appellate court can properly find abuse only if ... no reasonable [person] would take the view adopted by the trial court.' " *Butterfield,* 2001 UT 59 at ¶ 28, 27 P.3d 1133 (alteration in original) (quoting *State v. Gerrard,* 584 P.2d 885, 887 (Utah 1978)). In this case, the trial court's refusal to allow Maestas's expert to testify can be overturned only if no reasonable person would make the same decision. If, however, the trial court reasonably determined to exclude expert testimony after considering elements of the *Rimmasch* test, it did not abuse its discretion.

¶ 73 In the case at bar, the only question with respect to the *Rimmasch* standard is whether the trial court appropriately found that the proposed eyewitness expert testimony did not meet the third prong of the *Rimmasch* test.[1] Explaining the third prong, this court elaborated that the court should consider "whether, on balance, the evidence will be helpful to the finder of fact." *Rimmasch,* 775 P.2d at 398 n. 8. Here, Maestas claimed the trial court erred in refusing to

---

1. The State did not challenge the admission of expert testimony under the first two prongs of *Rimmasch.*

allow expert testimony regarding eyewitness identifications. After a *Ramirez* hearing [2] to examine the reliability of the eyewitnesses' testimony, the court held that four of the seven eyewitnesses to the robberies would be permitted to testify that Maestas was the person who committed the robberies. As to the other eyewitnesses, the court held that they would not be allowed to identify Maestas as the perpetrator, but would be allowed to relate other details of the robberies that they observed.

¶ 74 The trial court also determined that the expert testimony Maestas sought to present "would have significant tendency to cause the jury to abdicate its role as a fact finder." The risk that the jury will fail to perform its duty as an independent arbiter of the facts is a legitimate countervailing concern that must be balanced against the probative value of the proffered expert testimony. *See Hubbard*, 2002 UT 45 at ¶ 15, 48 P.3d 953. In regard to this balance, the trial court held that Maestas could adequately present the scientific bases concerning the fallibility of eyewitness identifications by means of "thorough instructions on the concerns about and factors . . . set forth in the *Long* case." Such instructions give Maestas the opportunity to "educate the jury with respect to the factors set forth in *Long,* . . . [and to] argue how each of those factors could have affected particular eyewitnesses." *Maestas I,* 1999 UT 32 at ¶ 30, 984 P.2d 376. Thus, the trial court's ruling was reasonable and does not preclude Maestas from presenting the basic information that he desired to relate to the jury via his expert witness.

¶ 75 Moreover, the trial court is in the best position to balance the probative value of proffered testimony against the risk of intrusion upon the fact-finding functions of the jury. Hence, we should accord it broad discretion in admitting or excluding expert testimony such as that in issue here. I would affirm the trial court's exercise of its broad discretion because I cannot conclude that "no reasonable person would take the view adopted by the trial court."

¶ 76 In my view, it is clear, in light of both our case law and rule 702, that Chief Justice Durham's conclusion that the trial court abused its discretion is incorrect. Neither our case law nor rule 702 justifies the creation of a rule mandating the admission of expert testimony. Instead, both plainly support leaving the determination of whether to admit expert testimony up to the discretion of the trial court. Accordingly, I would hold that the trial court acted within its discretion in excluding the expert identification testimony.

## II. RULE 24(d) OF THE UTAH RULES OF CRIMINAL PROCEDURE DOES NOT PRECLUDE THE ADMISSION OF MAESTAS'S ALLOCUTION STATEMENT

¶ 77 I also disagree with Chief Justice Durham's proposal in part II.B to craft a new rule governing retrials resulting from appeals. Recognizing that rule 24(d) does not apply to new trials arising from appeals, Chief Justice Durham would create a rule, using this court's inherent supervisory power, which adopts rule 24(d)'s "same position" language and requires the exclusion of Maestas's entire allocution statement.

¶ 78 For two reasons, I dissent on this point. First, I disagree with Chief Justice Durham's proposed use of this court's supervisory authority to promulgate a new rule of criminal procedure mirroring rule 24(d). Second, I disagree with the lead opinion's analysis of what rule 24(d) provides. I believe the plain language of rule 24(d) and related rules, together with pertinent case law and rules of statutory construction, strongly indicate that the drafters of rule 24(d) [3] did not intend that the "same posi-

---

2. *See State v. Ramirez,* 817 P.2d 774 (Utah 1991). In *Ramirez,* this court held that a defendant is "entitled to a determination by the court of the evidence's constitutional admissibility." *Id.* at 778. Once determined to be constitutionally admissible, the evidence may then be presented to the jury.

3. Because the lead opinion uses rule 24(d) as a guide to create the new rule for retrials following appeal, the same arguments against expansion apply to both rules. Therefore, my discussion, while using the term "rule 24(d)," has application to the new rule created today.

tion" language operate to exclude evidence obtained since the original trial.

¶ 79 Because I conclude that rule 24(d) does not bar the admission of Maestas's allocution statement, I hereafter review whether constitutional considerations would block its admission. From this review, I conclude that constitutional considerations do not bar the admission of Maestas's allocution statement. Therefore, I would affirm the trial court's ruling to admit Maestas's allocution statement.

### A. The Court's Inherent Supervisory Power Should Not Be Used to Create a New Rule of Criminal Procedure

¶ 80 Concluding that rule 24(d) does not apply to this situation, Chief Justice Durham, nevertheless, relies on the inherent supervisory powers of the court to fashion a new rule mirroring rule 24(d) to govern new trials following appeals. I disagree with this approach. By adopting this new rule, the lead opinion would, in effect, amend current rules of criminal procedure. However, the appropriate procedure for making such amendments is governed by rule 11–101(1)(A) of the Utah Code of Judicial Administration. Because Utah Rules of Criminal Procedure 24 and 28 speak for themselves, they ought not be modified without following the appropriate procedure.

¶ 81 Our inherent supervisory power stems from our authority "to adopt rules of procedure and evidence to be used in the courts of the state." Utah Const. art. VIII, § 4. We have further explained that "[t]he courts' inherent supervisory power is that which is necessary to protect the fundamental integrity of the judicial branch, and it may not be wholly delegated to a nonjudicial officer. This power enables a court to ensure that the judicial process is not abused." *In re Criminal Investigation*, 754 P.2d 633, 642 (Utah 1988) (citations omitted). We have elected, however, to regulate the exercise of our rulemaking authority, establishing a rulemaking process "for the adoption, repeal, and amendment of rules of procedure and evidence." Utah Code of Judicial Admin. 11–101(1)(A). Through this process, advisory committees propose changes to the rules, which are then

made available for public comment prior to adoption. *See id.* The process even provides an opportunity for this court, in our discretion, to "adopt rules of procedure or evidence ... upon [our] own initiative and without proposals by the committees." *Id.* 11–101(4)(C). Such rules, however, still must "be published for a 45–day public comment period." *Id.* There is no provision in this rulemaking process, though, supporting Chief Justice Durham's proposal to use our inherent supervisory power to make an immediate change to the rules.

¶ 82 While we have relied on our inherent supervisory power to formulate new rules in the past, we only did so to explain or interpret existing case law, rules, or statutory requirements. *See State v. Bennett*, 2000 UT 34, ¶ 13, 999 P.2d 1 (Durham, J., concurring) (listing several Utah cases). This new rule does not explain or interpret existing case law, rules, or statutory requirements, however. It is a completely new rule regulating trials following appeal that has the effect of amending rule 28 of the Utah Rules of Criminal Procedure, which regulates dispositions following appeal. The appropriate method for amending rule 28 is to follow the process outlined in rule 11–101.

¶ 83 By resorting to our inherent supervisory power, the lead opinion undermines our established rulemaking process, and implies that we can ignore our own process and procedures to achieve what is considered to be the appropriate decision. Any attempt to circumvent the procedures outlined in rule 11–101(1)(A) or 11–101(4)(C) weakens the process we have established to amend the rules of procedure and evidence. I believe that we should not use our inherent supervisory power to supplant our established rulemaking process.

### B. The Intended Meaning of Rule 24

¶ 84 Chief Justice Durham's interpretation of rule 24(d), requiring reversal of the trial court's decision to admit Maestas's allocution statement, is flawed in several respects. First, the plain language of rule 24 and rule 28 shows that the drafters of those rules intended that new trials following a motion be treated differently from new trials follow-

ing an appeal. Second, Chief Justice Durham incorrectly interprets the "same position" language found in rule 24. Third, her interpretation of rule 24 is incompatible with modern interpretations involving evidence. Finally, her interpretation of rule 24 conflicts with our case law on newly discovered evidence. Because the lead opinion uses a flawed analysis of rule 24, it incorrectly concludes that Maestas's sentencing statement must be excluded. I believe that under a correct interpretation of the rule, Maestas's statement should be admitted.

1. The Plain Language of Rule 24 and Rule 28 Demonstrates the Inappropriateness of Forging a New Rule Regarding New Trials Awarded By Appellate Courts

¶ 85 The plain language of rule 24 limits its scope to new trials that result from a trial court granting a motion for a new trial. Utah R.Crim. P. 24(a)-(c) (describing procedures for moving for a new trial at the trial court level). Here, however, we are concerned with a new trial following a reversal by an appellate court. This situation is specifically addressed by another rule of criminal procedure—rule 28. Utah R.Crim. P. 28 ("Disposition after appeal"). In contrast to rule 24, rule 28 does not specify that an accused who is awarded a new trial by an appellate court be placed in the "same position" as before the original trial. This difference clearly indicates that the drafters of the rules of criminal procedure did not intend the "same position" language to apply to a new trial following a reversal.

¶ 86 The inclusion of the "same position" language in rule 24 and the omission of this language from rule 28 conforms with widely recognized differences between a new trial obtained as a result of a motion to a trial court and a new trial following an appellate court's reversal. When a trial court grants a motion for a new trial, as a general rule, "the trial of the case proceeds de novo" and the trial court hearing the new trial is not bound by the rulings of the court in the previous

trial. 58 Am.Jur.2d. *New Trial* § 587 (1989). Thus, in many respects, an accused receiving a new trial upon motion to a trial court is returned to the same position as the accused was in before his or her first trial. *See generally id.* §§ 587–88.

¶ 87 In contrast, a new trial following appellate review is subject to the "law of the case" doctrine. *See Gildea v. Guardian Title Co.,* 2001 UT 75, ¶ 9, 31 P.3d 543; *Thurston v. Box Elder County,* 892 P.2d 1034, 1037–38 (Utah 1995); *Plumb v. State,* 809 P.2d 734, 739 (Utah 1990). "Under the law of the case doctrine, issues resolved by [an appellate court] bind the trial court on remand." *Gildea,* 2001 UT 75 at ¶ 9, 31 P.3d 543. Because an appellate court generally resolves certain issues when it awards a new trial, the accused does not begin the new trial in the same position as he or she was in at the start of the original trial, when all issues were unresolved.

¶ 88 Accordingly, it is unlikely that the drafters of the rules of criminal procedure intended rule 24's "same position" language to apply to new trials following a reversed conviction. Moreover, even assuming arguendo, as the lead opinion does, that rule 24(d) applies by analogy to new trials following a reversal by an appellate court, I would conclude that its drafters did not intend that it place the parties in the same position in terms of evidence.

2. The History and Purpose of the "Same Position" Language

¶ 89 While Chief Justice Durham "decline[s] to decide whether rule 24(d) applies to new trials after appeal" and crafts a new rule instead, she finds the "same position" language of rule 24(d) to be "critical." The lead opinion notes that to properly construe this term, one must pay "close attention to [its] exact language." However, Chief Justice Durham's interpretation of the "same position" language conflicts with its purpose and history.[4]

---

4. Prior to 1989, the Utah Rules of Criminal Procedure existed as statutory enactments subject to revision by the state legislature. In *In re Rules of Procedure and Evidence to be Used in the Courts of This State,* filed January 13, 1989, we

"adopt[ed] all existing statutory rules of procedure and evidence contained in Utah Code Ann. §§ 77–35–1 to –33 (1982 & Supp.1988)." Utah R.Crim. P. compiler's notes. When interpreting these adopted rules, we look to the drafters'

#### a. Purpose Behind the "Same Position" Language

¶ 90 Chief Justice Durham argues that the plain meaning of the "same position" language requires the restoration of both the defendant and the State to the same circumstances that existed prior to the faulty trial. After thus interpreting rule 24(d), however, she later states in a footnote, "If the defendant testifies at retrial, however, he may be impeached by the use of statements made at the allocution." If the drafters of rule 24(d) indeed intended that the parties be returned to the circumstances that prevailed before the first trial, it would follow that the prosecution could not use the allocution statement for any purpose, since the statement did not exist before the first trial. Based on this qualification, however, it appears that Chief Justice Durham's "same position" language is not as absolute as she suggests.

¶ 91 Additionally, although case law on the "same position" language extends back to the nineteenth century in numerous jurisdictions, the lead opinion cites no cases, nor are we aware of any, applying the "same position" language to return the parties to the same position in terms of *evidence*. Indeed, Chief Justice Durham's interpretation is untenable in light of the purpose behind the "same position" language and the historical development of the rule containing it.

¶ 92 Contrary to Chief Justice Durham's conclusion, it appears certain that the drafters of the "same position" language intended it to protect the interests of the State, not the accused. Under nineteenth century common law, it was widely held that an appeal of a conviction did not constitute a waiver of the accused's double jeopardy rights. *See, e.g., Trono v. United States*, 199 U.S. 521, 530–31, 533–34, 26 S.Ct. 121, 50 L.Ed. 292 (1905). Under this common law rule, an accused who was granted a new trial could be retried only for the crime for which he or she was con-

victed. *Id.* at 531, 26 S.Ct. 121. The accused could not be retried for any other crimes for which he or she was placed in jeopardy, but not convicted, at the first trial. *Id.* In short, the common law placed the accused in a different position than he or she was in at the first trial in terms of double jeopardy.

¶ 93 To override this common law rule and permit the accused to be prosecuted for the same offenses as at the first trial, several states in the nineteenth century passed legislation that conditioned the awarding of a new trial on the accused being returned to the "same position" he or she was in prior to the first trial. *Id.* (noting that the "same position" language in state statutes was intended to act as a waiver of a defendant's right to claim that a second prosecution following a reversal violates double jeopardy); *see also United States ex rel. Hetenyi v. Wilkins*, 348 F.2d 844, 858 (2d Cir.1965) (noting that legislation containing the "same position" language had been passed in response to the common law rule and "authoriz[ed] reprosecution on the greater degree charged if the conviction on the lesser degree is reversed"); *Commonwealth v. Arnold*, 83 Ky. 1, 3, 6 (1884) (holding that pursuant to the legislature's prerogative to "prescribe ... the terms upon which" one who has been convicted of a lesser included offense may have a new trial, the legislature could authorize retrial on the greater offense by prescribing that the " 'granting of a new trial places the parties in the same position as if no trial had been had,' " quoting Ky.Crim.Code § 270, thereby allowing retrial of the accused on the greater offense for which the accused was acquitted).[5]

¶ 94 Because Utah codified the "same position" language contemporaneously with other states that codified the exact same language, its drafters very likely had the same purpose: to ensure the State had the same flexibility as it had at the first trial in terms of charging and prosecuting the accused. This purpose had nothing to do with the exclusion of

---

intent. *See State v. Smith*, 812 P.2d 470, 478 n. 3 (Utah Ct.App.1991).

5. Under our present law, the double jeopardy clause "protects against successive prosecutions for the same offense after acquittal." *Monge v. California*, 524 U.S. 721, 727–28, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998); *see also Green v. United*

*States*, 355 U.S. 184, 193–94, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). The examples in the above text, however, provide a historical context for the adoption of the "same position" language and underline the idea that the "same position" language was not intended to apply to evidence.

evidence, as far as I can see.[6] Indeed, evidentiary issues were specifically addressed by another clause, which provided that " 'all the testimony must be produced anew' " at the new trial. *Hopt v. Utah*, 120 U.S. 430, 442, 7 S.Ct. 614, 30 L.Ed. 708 (1887) (quoting 1878 Utah Laws § 317). Since evidentiary issues were specifically addressed by another clause, it is unlikely the drafters intended the "same position" language to also address evidentiary issues.

### b. Legislative History

¶ 95 In addition to not analyzing the historical purpose of the "same position" language, Chief Justice Durham overlooks another critical indicator of legislative intent. Because a legislature presumably intends to "change existing legal rights" when it amends a statute, courts attempting to discern a legislature's current intentions are careful to take into account the effect of statutory amendments. *Olsen v. Samuel McIntyre Inv. Co.*, 956 P.2d 257, 261 (Utah 1998) (citations and internal quotations omitted). Significantly, Chief Justice Durham's interpretation does not account for a pertinent amendment following the codification of the "same position" language in the original territorial regulation. Specifically, a comparison of the territorial regulation interpreted in *Hopt* to the current rule 24(d) reveals that, at some point, the drafters deleted the language requiring that "all the testimony must be produced anew." *Compare Hopt*, 120 U.S. at 442, 7 S.Ct. 614, *with* Utah R.Crim. P. 24(d). This deletion further supports interpreting rule 24(d) as not excluding evidence from the first trial.

¶ 96 Case law from other jurisdictions directly supports this position. In *Montana ex rel. Mazurek v. District Court*, 2000 MT 266, 302 Mont. 39, 22 P.3d 166, for example, a trial court precluded the prosecution from using the defendant's testimony from his first trial during its case in chief at the new trial. *Id.* at ¶ 2. In reaching this conclusion, the trial court reasoned that the prosecution's use of defendant's prior testimony would violate a Montana statute that provided " 'the granting of a new trial places the parties in the *same position as if there had been no trial*.' " *Id.* at ¶ 10 (quoting Mont. Code Ann. § 46–16–701).

¶ 97 On appeal, the State argued that a review of the historical changes in the statute "reveal[ed] that the Montana Legislature did not intend for the current version of [the statute] to preclude the use of prior testimony in a new trial." *Id.* at ¶ 14. Agreeing with the State's argument, the Montana Supreme Court noted that, in addition to the "same position" language, an 1895 version of the statute had also included language that provided that "[a]ll the testimony must be produced anew." *Id.* at ¶ 15 (quoting Mont. Rev.Code § 2191 (1895)). This language, noted the court, had precluded the use of prior testimony on retrial. *Id.* However, the Montana Legislature "delet[ed] the language requiring that testimony be produced anew" from the later versions of the statute. *Id.* at ¶ 17. The *Mazurek* court interpreted this modification as being "intended to change the existing law and allow the use of testimony from a prior trial in a new trial." *Id.* at ¶ 18. Accordingly, the court concluded that the current statute did not preclude the prosecu-

6. The United States Supreme Court's interpretation of the Utah territorial regulation that originally enacted the "same position" language supports this view. *Hopt v. Utah* involved a retrial in which "the counsel for the prosecution alluded to the case as the most remarkable one ever tried in the territory, and to 'the many times it had been brought before the tribunals.' " 120 U.S. 430, 442, 7 S.Ct. 614, 30 L.Ed. 708 (1887). In rejecting the defense's contention that the prosecutor's allusion violated a Utah territorial regulation predating rule 24, the United States Supreme Court limited its analysis to whether the prosecutor had referred to the verdict:

The counsel for the defendant now contends that this allusion was in contravention of that section of the act of the territory regulating proceedings in criminal cases, which declares that "the granting of a new trial places the parties in the *same position* as if no trial had been had," and that "all the testimony must be produced anew, and the former verdict cannot be used or referred to either in evidence or in argument." [1878 Utah Laws § 317.] The object of this law was to prevent the accused from being prejudiced by reference to any former conviction on the same indictment. *There was, in fact, no reference to any verdict on a previous trial*, but merely a mention of the times the case had been before the courts, so as to magnify its importance.
*Id.* (emphasis added).

tion from using the defendant's prior testimony during its case in chief on retrial, even though the current statute included a "same position" requirement.

¶ 98 The historical changes associated with rule 24(d)'s legislative history are nearly identical to those of the Montana statute interpreted in *Mazurek*. In removing the language requiring testimony to be produced anew, the drafters of rule 24(d) evidenced an intent not to preclude the admission of prior testimony. Chief Justice Durham has not accounted for this pertinent indicator of legislative intent.

### 3. Modern Interpretations Involving Evidence

¶ 99 In addition to conflicting with the original intent and legislative history associated with the "same position" language, Chief Justice Durham's interpretation conflicts with modern cases dealing with the "same position" language in the context of evidentiary issues. These cases make clear that the "same position" language is not intended to place the parties in the "same position" in terms of what evidence they may use. Rather, cases applying the language clearly anticipate that parties on retrial will supplement the evidence from the first trial with additional evidence. For example, in *Gospel Army v. Los Angeles*, the United States Supreme Court held as follows:

> [U]nder California law, the Gospel Army on the second trial to which it is entitled may amend its complaint and *present new facts*. Such a reversal remands the case for a new trial and places the parties in the *same position* as if the case had never been tried . . . . *[On retrial, the] law must be applied by the trial court to the evidence presented [at] the second trial.*

*Gospel Army v. Los Angeles*, 331 U.S. 543, 547–48, 67 S.Ct. 1428, 91 L.Ed. 1662 (1947) (emphasis added) (internal quotations and citation omitted).

¶ 100 Cases like *Gospel Army* indicate that if the "same position" language applies at all in the evidentiary context, it requires that the parties have the same flexibility to discover and present evidence as they did at the beginning of the first trial. *See also United States v. Akers*, 702 F.2d 1145, 1148 (D.C.Cir. 1983) (collecting cases demonstrating that "same position" and other similarly-worded requirements are intended to provide parties the same flexibility regarding evidence). Properly interpreted, rule 24(d) affirmatively permits the parties to take advantage of all the evidence available at the start of the trial. Due to the progression of time, of course, placing the parties in the same position in terms of their ability to gather evidence will permit them to rely upon evidence that may not have been available at the start of the original trial.

¶ 101 Chief Justice Durham's interpretation places the parties in a *different position* in terms of their ability to discover and use evidence. More specifically, by preventing further discovery of evidence, Chief Justice Durham's interpretation places the parties in a decidedly different position as compared to the start of the first trial, when the parties remained free to discover and rely upon new evidence.

### 4. Utah Case Law Concerning Newly Discovered Evidence

¶ 102 Chief Justice Durham's interpretation is also fundamentally incompatible with Utah precedent providing for a new trial based on newly discovered evidence. *State v. James*, 819 P.2d 781, 793 (Utah 1991) (holding that "to constitute grounds for a new trial," newly discovered evidence must, among other things, "render a different result probable on the retrial of the case" (footnote and citation omitted)). Newly discovered evidence is, by definition, evidence that was not available at the start of the first trial. *Id.* By requiring that the parties be returned to the "circumstances that existed prior to" the first trial, Chief Justice Durham's interpretation would, by its terms, preclude the admission of newly discovered evidence on retrial.

¶ 103 In contrast, no such conflict exists with an interpretation of the "same position" language that affords the parties the same flexibility they had at the first trial in terms of presenting evidence. As in the first trial, on retrial both parties would be able to pres-

ent all evidence currently available to them, including newly discovered evidence.

## 5. Summary

¶ 104 In summary, rule 24(d)'s "same position" language does not require suppression of Maestas's allocution statement. The inclusion of the "same position" language in the rule governing new trials awarded by the trial court, together with its omission from the rule governing new trials awarded by an appellate court, clearly indicates that the drafters of the rules of criminal procedure did not intend the language to apply to the latter situation. This makes sense given that under the "law of the case" doctrine an appellate court's rulings place the accused in a different position as compared to the first trial.

¶ 105 Moreover, even assuming arguendo that the "same position" applies to reversals by an appellate court, neither the original intent, legislative history, nor modern interpretations of the language suggest that it was intended to constrain the parties to use only the evidence that was available at the beginning of the first trial. Indeed, Chief Justice Durham's interpretation cannot be reconciled with Utah case law under which a new trial may be awarded upon discovery of new evidence.

¶ 106 In contrast, an interpretation under which the parties are placed in the "same

position" in terms of their ability to use all evidence available to them better comports with modern interpretations of the language and Utah precedent pertaining to newly discovered evidence. Under the correct interpretation of rule 24(d), then, the parties may avail themselves of all evidence available to them at the start of the new trial.[7] The only restriction placed on them by rule 24(d) is that the State may not refer to the verdict in the first trial. Utah R.Crim. P. 24(d). In this regard, I note that references to the verdict may be readily redacted from Maestas's statement.[8]

## C. Admission of Maestas's Statement in the Prosecution's Case in Chief Does Not Violate the Federal or State Constitutions

¶ 107 Having concluded that rule 24(d) does not prohibit the parties from relying upon new evidence, I now examine in this section whether there is any constitutional bar to the admission of Maestas's allocution statement. Since rule 24 provides inadequate justification for overturning the trial court's decision, this question must be addressed to determine whether the lower court appropriately admitted Maestas's sentencing statement. Because, in my view, neither the state nor the federal constitution would bar admission of Maestas's statement, I would affirm the trial court's determination to admit the statement at trial.

7. Of course, as at the beginning of the first trial, the admissibility of evidence at a new trial is subject to the rules of evidence and the state and federal constitutions. Maestas has not argued that any rule of evidence renders his statement inadmissible. In this case, Maestas has not shown that either the federal or state constitution precludes the admission of the statement.

8. Although Maestas did not mention the verdict in his allocution statement, he referred to the presentence report and the recommended sentence of fifty-six years contained therein, and asked for leniency in this regard. Since these portions of his statement necessarily confirm that Maestas had been convicted, they could be redacted from his statement as follows:

I know that I had admitted to the robberies that I done. I do have remorse for the victims, you know, and I regret doing what I did. I can be a changed person. I was ... I committed robbery before. I done time in prison. I

got out, and I completed the programs and everything. I got caught up in drugs, which I have never had any offense for, and I got caught up in them, and I committed these robberies and my intents wasn't to hurt anybody. I wasn't going to hurt anybody.... I can be changed. I have showed that before. For the same reason, the prosecution is precluded from mentioning either that the statement was an allocution or that it originated at a sentencing hearing. This would not prevent Maestas from introducing this information, however, if he desires, for his own strategic purposes to do so. *Cf. Hopt*, 120 U.S. at 442, 7 S.Ct. 614 (noting that the object of similarly-worded Utah territorial statute "was to prevent the accused from being *prejudiced* by reference to any former conviction on the same indictment" (emphasis added) (construing 1878 Utah Laws § 317)). Nor would Maestas be prevented from arguing at trial that the Utah Rules of Evidence require exclusion of portions of the remainder, such as Maestas's reference to his earlier crimes.

### 1. Right of Allocution Does Not Include the Right to Suppress Allocution Statement Under the Utah Constitution

¶ 108 Chief Justice Durham's comments regarding allocution seem intended to establish that an accused has a right to present a statement in mitigation at sentencing. This is a red herring given that Maestas had an opportunity to allocute and did so. The real issue is whether an accused who has obtained the benefits presumptively associated with allocuting also has the right to the additional benefit of suppressing the allocution statement on retrial, notwithstanding the State's and victims' compelling interest in providing this highly probative evidence to the jury. As this section demonstrates, Maestas's right of allocution does not include the right to suppress the statement at a new trial.

¶ 109 Chief Justice Durham notes that the *Anderson* court stated that "Utah Rule of Criminal Procedure 22 implements the constitutional right [of allocution]." *State v. Anderson*, 929 P.2d 1107, 1110 (Utah 1996). Significantly, in implementing the right of allocution, rule 22 does not specify that an accused has a right to suppress his allocution statement at a new trial. *See* Utah R.Crim. P. 22.

¶ 110 It is also worth noting that the Utah Constitution does not expressly mention the right of allocution. *Anderson*, 929 P.2d at 1111. Rather, the *Anderson* court concluded that the right was implied by the constitution because the right to allocution "is an inseparable part of the right to be present." *Id.* The right to suppress an allocution statement would be even further removed from the text of the Utah Constitution. Specifically, to conclude that the constitution provides this right would require an inference upon an inference: namely, that the right to suppress an allocution is implied by the right of allocution, which in turn is implied by the constitutional right to be present. Significantly, the right to suppress an accused's trial testimony has not been inferred from the constitutional right to testify in one's defense, even though the right to testify in one's defense is at least as important as the right of allocution and more universally recognized. *See Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct.

2008, 20 L.Ed.2d 1047 (1968) (acknowledging and "not question[ing] the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings"); *United States v. Girdner*, 773 F.2d 257, 259 (10th Cir.1985) (holding that the defendant's Fifth Amendment argument was "without merit" because he had not invoked the right at the previous trial); *State v. Tellay*, 100 Utah 25, 28, 110 P.2d 342, 343 (1941) (holding that because the "defendant voluntarily, of his own violation, and under the guidance of his counsel, went upon the witness stand and told his story" in a previous trial, he could not argue against the admission of his testimony in a subsequent trial); *People v. Evans*, 58 N.Y.2d 14, 457 N.Y.S.2d 757, 444 N.E.2d 7, 12 (1982) (holding that neither the constitution nor statute required the exclusion of the defendant's pre-plea statements at retrial following appeal); 3 Charles E. Torcia, *Wharton's Criminal Procedure*, § 357 (13th ed. 1991 & Supp.2001) (stating a defendant who takes the stand "without asserting the privilege against self-incrimination ... waive[s] the privilege as to the testimony, and hence such testimony may be used against him at a subsequent criminal trial") [hereinafter Torcia].

¶ 111 Accordingly, I do not believe that we can legitimately conclude that the drafters of the Utah Constitution intended to entitle an accused to suppress his allocution statement. We should require a much clearer expression of this intent in the constitutional text, especially when the State and victims have a compelling interest in admitting evidence of guilt. As it stands, we would be creating the exclusionary rule virtually out of thin air.

### 2. No Federal Constitutional Theories Bar Admission of Maestas's Statement

¶ 112 None of Maestas's other constitutional arguments for suppressing his allocution statement are persuasive. Maestas argues that admitting the statement would violate his Fifth Amendment right against self-incrimination, that the use of his statement in a subsequent retrial places an unconstitutional restriction on his right to allocute, and that the statement should be excluded as fruit of

the poisonous tree. For the reasons given below I would reject these arguments.

### a. Fifth Amendment Violation

¶ 113 Relying on cases such as *Mitchell v. United States*, 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), Maestas contends that admission of his allocution statement violates his Fifth Amendment rights because (1) he did not knowingly and intelligently waive his privilege against self-incrimination, and (2) he was compelled to allocute to obtain leniency in sentencing. I conclude that the Fifth Amendment does not bar admission of Maestas's allocution statement.

### i. Knowing and Intelligent Waiver

¶ 114 Maestas contends that the Fifth Amendment imposes a duty on the sentencing court to engage in a colloquy or otherwise ensure a convicted person is knowingly waiving his Fifth Amendment rights by making a statement. Yet, it is widely recognized that the Fifth Amendment does not require a judge to warn a represented defendant of his privilege against self-incrimination prior to testifying. Torcia, § 350 (citing, inter alia, *United States v. Block*, 88 F.2d 618 (2d Cir. 1937)). Although the United States Supreme Court has yet to directly apply this rule to statements at sentencing, the Court's related jurisprudence strongly supports such an application. In *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980), the Supreme Court placed the burden on the defendant or his counsel to recognize and claim the privilege against self-incrimination at sentencing. *Id.* at 559–61, 100 S.Ct. 1358. Since *Roberts* places no burden on the sentencing court to sua sponte advise the defendant of his privilege against self-incrimination, a fortiori, the sentencing court need not ensure knowledge of the privilege when

it merely affords a defendant, in the presence of his counsel, the opportunity to make an open-ended statement pursuant to his right to allocute. Thus, a court has no duty to ensure, prior to an accused allocuting, that the accused knows of the privilege against self-incrimination.

¶ 115 Moreover, a defendant who testifies in an earlier prosecution "without asserting the privilege against self-incrimination[ ] is deemed to have waived the privilege as to the testimony, and hence such testimony may be used against him at a subsequent criminal trial." Torcia, § 357; *see also Tellay*, 110 P.2d at 343. In short, admission of an accused's testimony from a proceeding in which the accused was represented by counsel does not violate the Fifth Amendment based on the fact that the judge presiding at the former proceeding did not inform the accused of his privilege against self-incrimination.

¶ 116 Accordingly, Maestas's statement at his sentencing hearing is not rendered inadmissible at retrial because the sentencing court did not inform him of the privilege against self-incrimination.[9]

### ii. Voluntariness of the Allocution Statement

¶ 117 I next address whether Maestas's statement was compelled or involuntary. In contending that his statement at sentencing was involuntary, Maestas does not claim that the sentencing judge compelled him to attend, or participate in, the sentencing hearing. Nor does Maestas claim that the sentencing judge threatened him with a harsher penalty if he refused to admit to the robberies, or promised him leniency if he did. Instead, Maestas concedes in his brief that, after his conviction for the robberies, he allocuted to obtain leniency.[10] The pressure to

---

9. Relying on *Mitchell,* Maestas also claims that even if he waived his privilege at sentencing, his statement could only be used for sentencing purposes. Nothing in *Mitchell,* however, limits the scope of a waiver at sentencing so as to prevent admission of Maestas's statement at his new trial. Unlike the situation in *Mitchell,* the government here does not seek to compel Maestas to give additional testimony at a later proceeding. Rather, the government seeks only to admit evidence (i.e., a transcript) of Maestas's earlier

statement at sentencing. This is not an unconstitutional broadening of the scope of Maestas's waiver. *Cf. Mitchell,* 526 U.S. at 324, 119 S.Ct. 1307 (noting that "once the plea has been accepted, statements or admissions made during the preceding plea colloquy are later admissible against the defendant, as is the plea itself").

10. If Maestas allocuted to obtain leniency, his attorney may have had a legitimate tactical basis for permitting Maestas to speak at sentencing.

obtain leniency, he argues, made his allocution statement involuntary and thus excludable.

¶ 118 Although a sentencing judge has the discretion to consider numerous factors in imposing sentence, including a defendant's acceptance of responsibility, any inducement this creates does not compel an accused to make self-incriminating statements within the meaning of the Fifth Amendment. *See Harvey v. Shillinger,* 76 F.3d 1528, 1531, 1535 (10th Cir.1996) (ruling that the defendant's allocution following conviction of various offenses was admissible at a later trial for conspiracy to commit the same offenses, even though the defendant had allocuted to *obtain* leniency). Applying the United States Supreme Court's Fifth Amendment jurisprudence to the specific context of statements made at sentencing, the *Harvey* court concluded as follows:

> [T]he privilege against compelled self-incrimination is *not offended* when a defendant yields to the pressure to testify on the issue of punishment in the hope of leniency. A defendant's choice to exercise the right to allocution, like the choice to exercise his right to testify, is entirely his own; he may speak to the court, but he is not required to do so.

*Id.* at 1535.

¶ 119 Chief Justice Durham argues that "[t]he right to allocution would be meaningless if a convicted person's allocution statements could be used against him or her in a subsequent prosecution." Chief Justice Durham fears that defendants will not allocute after being informed that their statements could be used against them at any retrial. All defendants have the right to testify in their own behalf *and* the right to refuse to testify against themselves. These two rights weigh against each other. Once a defendant has determined to testify, that defendant effectively waives the right to remain silent and the right to avoid the consequences of remaining silent. Torcia, § 357. By rendering Maestas's allocution statement inadmissible in this case, however, the lead opinion would elevate the right to allocution above the right to testify in one's own behalf, allowing a defendant to allocute without waiving the right to remain silent. Allocution statements would receive substantially more protection than statements made at trial. Such disparate treatment is not justified.

¶ 120 I agree with the reasoning of *Harvey* and reject Maestas's claim that his allocution statement was compelled and thus inadmissible. In choosing to speak at sentencing, Maestas made a choice similar to those frequently made by criminal defendants: instead of remaining silent and avoiding self-incrimination, he tried to mitigate his sentence by admitting to the robberies. The fact that Maestas allocuted to obtain leniency does not make the statement compelled or involuntary under the Fifth and Fourteenth Amendments. To the extent that Maestas felt pressure to speak due to his attorney's earlier ineffective assistance at trial, it goes to the weight of the statement, not its constitutional admissibility. *See Colorado v. Connelly,* 479 U.S. 157, 164–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (noting that a confession is not involuntary or inadmissible under the Due Process Clause even when it results from "outrageous behavior" of a non-state actor). Accordingly, I would hold that the trial court correctly ruled that Maestas's allocution statement was voluntary.

#### b. Unconstitutional Condition on Right to Allocute

¶ 121 Maestas further argues that admitting his allocution statement at his new trial creates an "intolerable" conflict between the Fifth Amendment and his right to allocute

---

In such a situation, a sentencing judge might interfere with a legitimate trial strategy by warning an accused that his statement at sentencing could be used at retrial. Such a colloquy, suggesting as it does the possibility of a successful appeal, might cause an accused to reject his attorney's advice and waive his right to allocute, only to have the appeal later rejected. *Cf. United States v. Pennycooke,* 65 F.3d 9, 11 (3d Cir.1995)

("A colloquy on the right to testify [when the defense rests] not only would be awkward, ... but more importantly inadvertently might cause the defendant to think that the court believes the defense has been insufficient. This belief in turn might prompt the defendant to abandon an appropriate defense strategy without good reason.").

and appeal. That is, he contends that he was subject to an unconstitutional condition, namely, in order to exercise the right to allocute and get a fair sentence, he had to sacrifice his right not to incriminate himself, and with it, his prospects at his new trial.

¶ 122 For this proposition, Maestas relies on *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), a case dealing with a conflict between the Fourth and Fifth Amendments. In holding that the inculpatory statements from a suppression hearing were inadmissible, the *Simmons* Court reasoned that it would be "intolerable" to condition the right to assert a Fourth Amendment claim on the waiver of a Fifth Amendment privilege against self-incrimination. *Id.* at 394, 88 S.Ct. 967.

¶ 123 The State correctly notes that United States Supreme Court decisions following *Simmons* have cast serious doubt on the continuing viability of its reasoning concerning conflicting constitutional rights. The United States Supreme Court decision in *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 285–86, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998), epitomizes the Supreme Court's decreased reliance on the "unconstitutional conditions" analysis in the Fifth Amendment context. Indeed, although the *Woodard* defendant alleged an unconstitutional conflict between his right to seek clemency and his right against self-incrimination, the Supreme Court summarily rejected this argument in concluding the clemency interview did not violate the Fifth Amendment. *See id.* at 286, 118 S.Ct. 1244.[11] Having concluded that Maestas waived his privilege against self-incrimination and gave his statement voluntarily, I similarly reject Maestas's "unconstitutional condition" argument. Accordingly, Maestas's voluntary allocution statement is not rendered inadmissible because of any supposed conflict between his right to allocute and his privilege against self-incrimination.

### c. Fruit of the Poisonous Tree

¶ 124 Moreover, Maestas argues that his statement should be excluded as fruit of the poisonous tree. Maestas does not, however, claim that his statement should be excluded because of police or prosecutorial misconduct. Rather he claims that his lawyer's ineffective assistance indirectly prejudiced him by causing him to allocute to obtain leniency. In *Maestas I*, we reversed Maestas's original conviction due to the direct prejudicial effect of his lawyer's failure to request a cautionary eyewitness instruction. *Maestas I*, 1999 UT 32 at ¶¶ 32–37, 984 P.2d 376. Maestas contends his allocution was therefore the "fruit" of a "poisonous tree," i.e., his lawyer's ineffective assistance and the tainted verdict.

¶ 125 Although originally set forth in a Fourth Amendment context, *Wong Sun v. United States*, 371 U.S. 471, 484–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the poisonous tree doctrine has since been extended to exclude the fruits of a violation of an accused's Sixth Amendment right to counsel. *See United States v. Wade*, 388 U.S. 218, 239–42, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *United States v. Terzado–Madruga*, 897 F.2d 1099, 1112–13 (11th Cir.1990); *United States v. Marshank*, 777 F.Supp. 1507, 1519 (N.D.Cal. 1991). In these cases, however, exclusion of the "fruits" of the Sixth Amendment violation was consistent with the justification behind the "poisonous tree's" exclusionary rule—deterrence of official misconduct. *See Wong Sun*, 371 U.S. at 485–86, 83 S.Ct. 407; *cf. State v. Allen*, 839 P.2d 291, 300–01 (Utah 1992) (evaluating whether statements were " 'tainted' by prior *police misconduct* " (emphasis added)). In contrast, Maestas does not contend that police or prosecutorial misconduct played any part in his counsel's failure to request a cautionary eyewitness instruction. As a result, exclusion of his allocution statement would not promote the deter-

**11.** In fact, the Supreme Court specifically held that the

> respondent has the ... choice of providing information to the Authority—at the risk of damaging his case for clemency or for postconviction relief—or of remaining silent. But this pressure to speak in the hope of improving his

chance of being granted clemency does not make the interview compelled. We therefore hold that the Ohio clemency interview, even on assumptions most favorable to respondent's claim, does not violate the Fifth Amendment privilege against compelled self-incrimination.

*Id.* at 287–88, 118 S.Ct. 1244.

rence rationale underlying the "poisonous tree" doctrine, and Maestas's allocution statement is not excludable under that doctrine.

3. Even If the Right of Allocution Requires Suppression of an Allocution Statement in Some Circumstances, It Does Not Require Suppression Under the Specific Facts of this Case

¶ 126 Even if a method of constitutional interpretation existed under which we could recognize a constitutional right to suppress an allocution statement, at best it would be a limited right. *See Anderson*, 929 P.2d at 1110–11 (rejecting an accused's argument that the right of allocution is an absolute right). In my mind, this would mean that the determination of whether or not to suppress an allocution statement would turn on the circumstances of each case and would involve consideration of countervailing interests. The circumstances in this case indicate that the interests in favor of allocution and suppression are weak, while the State's and victims' interests in admitting Maestas's highly probative statement are compelling. Accordingly, I would rule that the State may admit Maestas's allocution statement, with the deletions I have noted in footnote 8, in its case in chief.

a. The Interests in Favor of Allocution and Suppression Are Weak in This Case

¶ 127 The right to allocute was originally recognized in part because the accused was considered incompetent to testify at trial. *State v. Young*, 853 P.2d 327, 370 (Utah 1993) (Durham, J., dissenting) (detailing historical justifications for allocution). While an accused today may testify on his or her behalf, an accused may instead exercise his or her Fifth Amendment right to remain silent during trial. When this occurs, the interests in favor of allocution are at their highest, because the accused has not yet addressed the court or given a statement in mitigation. *Id.* at 370–71 (arguing that although the original reasons for allowing an accused to allocute no longer exist, modern courts now justify it on

the ground that it permits an accused to present mitigating information).

¶ 128 Here, however, Maestas not only testified at trial, but in so doing gave the ultimate in mitigating statements—he denied his guilt. His allocution rights were thus vindicated when he testified at trial. His admission of the crime at sentencing was not the exercise of any legitimate right; taken together with his contradictory trial testimony, it was a transparent attempt to manipulate the system. To now suppress Maestas's allocution statement would, in my mind, sanction and encourage such duplicity.

b. Society's and the Crime Victims' Interests in Admitting Evidence of a Crime Outweigh Maestas's Interests in Excluding the Allocution Statement

¶ 129 Our system of criminal justice involves not only the rights of the accused, but also the interests of society and of crime victims. Maestas's rights have been given due respect. He was permitted to deny his guilt at trial when this was beneficial to him; he was permitted to admit his guilt at sentencing when that suited him; and he was granted a new trial in the absence of any official misconduct. To now conclude that he also has the right to exclude his voluntary and public admission does not, in my mind, give due respect to the compelling interests of society and the victims of this violent crime to have this highly probative evidence available to the jury on retrial. I would rule that his statement is admissible in the prosecution's case in chief.

CONCLUSION

¶ 130 Admission of expert testimony on eyewitness identification is a matter of discretion for the trial court. Because the trial court properly analyzed the issues under rule 702 and came to a reasonable conclusion, its decision should be affirmed.

¶ 131 In addition, I see no reason to ask society and the victims of this crime to turn a deaf ear to Maestas's voluntary allocution statement. Evidence is excluded when officials violate a person's constitutional rights to obtain it. The exclusion of the evidence, it is

said, will remove an incentive to violate a person's constitutional rights. Here, however, the evidence in question—an allocution statement—was obtained when officials permitted a person to exercise his rights. Under these circumstances, there is no persuasive reason to exclude Maestas's statement. The right to testify in one's behalf, by way of comparison, does not encompass the right to exclude the testimony on retrial.

¶ 132 Under Chief Justice Durham's analysis, defendants who voluntarily and publicly admit to their crimes in a self-serving attempt to obtain leniency at sentencing may, on retrial, exclude their admissions and thereby potentially escape conviction. Excluding the admission from the courtroom would not, of course, erase the admission from the minds of the victims or their family members who may have been present during the sentencing hearing.[12] In a society built on respect for the rule of law, I have great concerns about creating a new rule under which persons who have admitted their guilt in open court can escape all consequences of that admission. Neither rule 24(d) nor the right of allocution requires such a result.

¶ 133 Justice WILKINS concurs in Associate Chief Justice DURRANT's dissenting and concurring opinion.

RUSSON, Justice, dissenting in part and concurring in part:

¶ 134 I dissent as to part I of Chief Justice Durham's opinion, concur as to part II.A, and concur as to part II.B but for a different reason.

¶ 135 In part I of her opinion, Chief Justice Durham addresses the issue of whether the trial court abused its discretion in prohibiting Maestas from offering the testimony of an expert witness on the general infirmity and unreliability of eyewitness identification. I dissent from the Chief Justice's opinion on this issue for two reasons: (1) the trial court did not abuse its discretion in prohibiting the expert testimony, and (2) Chief Justice Durham's holding goes too far in suggesting that

defendants are "entitled" to offer expert testimony of this nature and that defendants cannot receive a fair trial without it.

¶ 136 In this court's most recent pronouncement on the issue of the admissibility of expert testimony on the reliability of eyewitness identification, *State v. Hubbard*, 2002 UT 45, 48 P.3d 953, we held: " 'Whether expert testimony on the inherent deficiencies of eyewitness identification should be allowed is within the sound discretion of the trial court.' " *Id.* at ¶ 14 (quoting *State v. Butterfield*, 2001 UT 59, ¶ 43, 27 P.3d 1133). In *Hubbard*, we reiterated that "whether to allow proffered expert testimony regarding eyewitness identification testimony is a matter best left to the trial court's discretion because of the trial court's superior position to judge the advisability of allowing such testimony." *Id.* Under this standard of review, the trial court's ruling on the admissibility of expert testimony will stand unless the ruling "exceeds the limits of reasonability." *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794 (citation omitted).

¶ 137 In the case at hand, nothing in the record indicates that the trial court abused its discretion in excluding the testimony of Maestas' expert. Chief Justice Durham's opinion fails to explain or demonstrate how the trial court abused its discretion or how the trial court's decision to exclude the expert's testimony exceeded the limits of reasonability. The lead opinion simply restates our past observations on the inherent deficiencies of eyewitness identification and merely asserts, without explanation, that "given all the factors in this case, expert testimony will only act to clarify eyewitness testimony." Such conclusory statements and review of our previous case law are insufficient to reverse the trial court's ruling under our settled standard of review.

¶ 138 While this court's prior rulings' and the lead opinion's questioning of the reliability of eyewitness identification is valid, the admission of expert testimony is not necessary in every case to inform the jury of the deficiencies of such identifications. Defense

---

12. Crime victims have a constitutional right to attend important criminal justice hearings related to the crime. Utah Const. art. I, § 28(1)(b)

(expressly recognizing a victim's right "to be heard at important criminal justice hearings").

**650**

counsel may always cross-examine eyewitnesses. The purpose of cross-examination of an eyewitness by defense counsel is to inform the jury as to the deficiencies, if any, of that witness's perception and recollection of the defendant and the defendant's alleged criminal conduct. In addition, defense counsel may request an appropriate jury instruction, such as the *Long* instruction,[1] in order to enlighten the jury as to the inherent deficiency of eyewitness accounts generally.

¶ 139 The lead opinion essentially creates a per se rule of admissibility of expert testimony as to the deficiency of eyewitness identification when it holds that "defendants[ ] are *entitled to* the information experts on human memory can provide about its operation," and when it "agree[s]" with Maestas that "he cannot receive a fair trial without presenting expert testimony on the credibility of eyewitness identification." (Emphasis added.) We have refrained from adopting, either explicitly or implicitly, a per se rule of admissibility or inadmissibility of expert testimony regarding eyewitness identification testimony. *Hubbard*, 2002 UT 45 at ¶ 14, 48 P.3d 953. To hold that a defendant is entitled to such expert testimony would result in such experts being called by both the defendant and the prosecutor in every case. The decision on the admissibility of expert testimony in such cases should be left to the sound discretion of the trial court.

¶ 140 In regard to the lead opinion's treatment in part II.A of the admissibility of Maestas' statements in his presentence report, I concur. As to part II.B of the lead opinion, addressing the admissibility of Maestas' statements in his allocution, I concur but for a different reason. I agree with Chief Justice Durham's discussion and analysis of the history and role of allocution in the common law and in Utah law as set forth in part II.B.1 of the lead opinion. In that portion of the opinion, the Chief Justice notes that this court has "clearly and thoughtfully recognized a constitutionally guaranteed right to allocution [under the Utah Constitution]." The Chief Justice then correctly con-

cludes that "[t]he right to allocution would be meaningless if a convicted person's allocution statements could be used against him or her in a subsequent prosecution."

¶ 141 Instead of simply grounding its holding in this constitutional foundation, the lead opinion abandons this reasoning in favor of its rule 24(d) analysis in part II.B.2. I would decide the issue of the admissibility of Maestas' allocution statements on this constitutional ground and hold that the admission of his allocution statements in his subsequent trial would effectively infringe and render meaningless his state constitutional right to allocution. Such a holding would resolve the issue without the need to borrow from rule 24 beyond its usual interpretation and application.

¶ 142 Justice HOWE concurs in Justice RUSSON's concurring and dissenting opinion.

---

1. In *State v. Long*, 721 P.2d 483 (Utah 1986), this court delineated guidelines for a proper cautionary jury instruction on the inherent deficiencies

of eyewitness identification and suggested a model jury instruction on the subject.